Judge Pauley

08 CV 5575

339-08/WLJ

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
CHEM-TANKERS C.V.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

William L. Juska (WJ 0772)

RECEIVED
JUN 20 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---x

CHEM-TANKERS C.V.,

Plaintiff,

- against –

CODECOM S.A.,

Defendant.

---x

**08-Civ-**

**VERIFIED COMPLAINT**

Plaintiff CHEM-TANKERS C.V. (hereinafter "CHEM-TANKERS"), by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant CODECOM S.A.. (hereinafter "CODECOM") alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, Plaintiff CHEM-TANKERS was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Safariweg 50, 3605 MA Maarssen, The Netherlands.

3.    At all times relevant hereto, Defendant CODECOM was and still is a foreign business entity existing under the laws of a foreign country with an office and place of business at Carrera 100 No. 11 - 90 - Oficina: 415, Santiago de Cali, Colombia.

4.    CHEM-TANKERS, as the disponent owners of the M/V CHEM RIGEL, entered into a maritime contract of charter party with CODECOM, as charterer, under a Shelltime 4 form of time charter dated February 29, 2008 (the "Charter") for a period of six months, +/- 7 days at the charterer's option. Under the Charter, the vessel was to carry cargoes of Residual Oils, which the charterer advised is very similar to Diesel Oil.  A copy of the Charter is annexed hereto as Exhibit A.

5.    Under the terms of the February 29, 2008 charter party the vessel was to trade in the Caribbean Basin, excluding Cuba and the Orinoco River.

6.    On March 31, 2008 CODECOM ordered the Master of the vessel to proceed from Bahia de Pozuelos to Puerto Sucre at Cumana on the North Venezuelan coast  due to alleged congestion at the  previously intended port of Guanta Port.

7.    On April 11, 2008 the vessel took on bunkers (fuel) off Trinidad, completing the bunkering operation at 1635 hours, local time.

8.    On April 13 CODECOM ordered the Master to proceed to Guiria. On that date at Guiria the CHEM RIGEL loaded "residual oil" on instructions from CODECOM, and had loaded 325 cubic meters when loading was stopped by the Venezuelan authorities.

9. On April 14 and 16, 2008 the Venezuelan authorities took samples of the "residual oil" loaded on board the CHEM RIGEL. The vessel was then detained further by the Venezuelan Navy on the basis, according to a newspaper report dated June 11, 2008, copy attached as Exhibit B, that CODECOM was loading not "residual fuels" or oil waste, but rather was smuggling fuel of Venezuelan origin for use by a Colombian paramilitary organization.

10. On April 26, 2008 the Venezuelan authorities placed guards on board the vessel and shifted the vessel to an anchorage, where the vessel remains at anchor as of June 20, 2008, guarded by a Venezuelan Navy patrol boat.

11. In order to maintain the CHEM RIGEL in working order, CHEM-TANKERS has had to purchase two supplies of bunkers (fuel), which is the responsibility of CODECOM under Clause 7(a) of the Charter. To date, CHEM-TANKERS has expended **$71,200** to purchase bunkers which should have been supplied by CODECOM.

12. Under Clause 8 of the Charter CODECOM is obligated to pay daily hire in the amount of $9,250 and under Clause 9 that hire was to be paid "per calendar month in advance."

13. CODECOM paid hire through May 30, 2008 but, despite due demands from CHEM-TANKERS, has paid no hire for the month of June.

14. Due to CODECOM's failure to pay hire, and its breach of the Charter contract, CHEM-TANKERS, in accordance with Clause 9(a) of the Charter, withdrew the CHEM RIGEL from the service of CODECOM, which withdrawal became effective on June 12, 2008. CODECOM owes hire for the period from June 1 to June 12, 2008 at $9,250 per day, or a total of **$111,000**.

15. As the vessel continues to be detained by the Venezuelan authorities, CHEM-TANKERS claims detention from CODECOM at the daily Charter hire rate of $9,250. As of

June 19, 2008, the detention claim, running from June 13th, amounted to **$64,750** and is increasing by $9,250 per day.

16. The extended and continuing detention of the CHEM RIGEL for over 67 days in warm Venezuelan waters has caused the fouling of the vessel's bottom. The fouling of the vessel's bottom will require a special drydocking of the vessel, a loss of time and the consumption of extra bunkers in order to clean the vessel's hull.

17. It is anticipated that the vessel will lose the following time as a result of the fouling of its bottom: seven days due to slow steaming caused by the fouling, seven days in drydock to clean the vessel's bottom and then seven days to re-position the vessel for future employment. CHEM-TANKERS seeks damages for 21 days to be lost at the Charter rate of $9,250, or **$194,250**.

18. The cost of drydocking the CHEM-RIGEL and cleaning and repainting the vessel's bottom is estimated at Euros 116,996, or **$182,665.85** based on the rate of exchange in effect on June 19, 2008 (1 Euro = $1.561), as reported in Lloyd's List maritime newspaper.

18. The Charter between CHEM-TANKERS and CODECOM provides for disputes to be resolved by arbitration at London, England, with English law to apply. *See* Exhibit A, Clause 46(a) and (b).

19. CHEM-TANKERS has satisfied all of its obligations under the charter with CODECOM.

20. In all, CODECOM owes CHEM-TANKERS for damages for breach of Charter in the sum of **$623,865.85**, no part of which has been paid, though duly demanded.

21. This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for CHEM-TANKER's claims made or to be made in arbitration in London, England under English law, as agreed by the parties.

22. As a regular feature of English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements and the cost of the arbitration, all of which constitutes a part of the Plaintiff's claim and the amount sued for herein.

23. CHEM-TANKERS estimates that it will incur approximately **$250,000.00** in awardable attorneys fees, disbursements, and costs of the arbitration.

24. Interest is also typically awarded under English law and arbitration, regularly at the rate of LIBOR plus 1-2% compounded quarterly (approximately 6.0%). CHEM-TANKERS estimates that the arbitration in this action will be resolved in approximately two years. Accordingly, CHEM-TANKERS calculates that it will be awarded approximately **$78,914.44** in interest, which also constitutes a part of the Plaintiff's claim and the amount sued for herein.

25. In all, the claim for which CHEM-TANKERS sues in this action, as near as presently may be estimated, totals **$952,780.29**, no part of which has been paid by CODECOM. CHEM-TANKERS specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure CHEM-TANKERS.

26. Upon information and belief, and after investigation, Defendant CODECOM cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due to, from, or for the benefit of Defendant CODECOM

(hereinafter, "ASSETS"), including but not limited to "ASSETS" at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

**WHEREFORE**, Plaintiff CHEM-TANKERS prays:

a. That process in due form of law according to the practice of this Court issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it in the principal amount of **$623,865.85** plus interest, costs and attorneys fees;

b. That since Defendant cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant, up to and including the sum of **$952,780.29**, be restrained and attached, including but not limited to any cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other property of, belonging to, due to, from, or for the benefit of Defendant (collectively "ASSETS"), including but not limited to such "ASSETS" as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c. That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

    d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
June 20, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
CHEM-TANKERS C.V.

By: ______________________

William L. Juska (WJ 0772)
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

**ATTORNEY VERIFICATION**

State of New York )
) ss.:
County of New York )

WILLIAM L. JUSKA, being duly sworn, deposes and says as follows:

1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

William L. Juska

Sworn to before me this
20th day of June, 2008

Notary Public

JOAN SORRENTINO
Notary Public, State of New York
No. 01SO6067227
Qualified in New York County
Commission Expires December 3, 2009

# EXHIBIT A

*FAIRFORD SHIPPING*
*4th Floor*
*Hampton House*
*20 Albert Embankment*
*London SE1 7TJ*

# ORIGINAL

**Code word for this Charter Party**
**"SHELLTIME 4"**

Issued December 1984 amended December 2003

## Time Charter Party
**LONDON** *29th February 2008*

IT IS THIS DAY AGREED between *Chem-Tankers C.V.* of *Maarssen, The Netherlands* (hereinafter referred to as "Owners"), being owners *commercial operators* of the good motor/steam* vessel called *Chem Rigel* (hereinafter referred to as "the vessel") described as per Clause 1 hereof *and attached Q88* and *Codecom S.A.* of *Santiago de Cali, Colombia* (hereinafter referred to as "Charterers"):

**Description And Condition of Vessel**

1. At the date of delivery of the vessel under this charter and throughout the charter period:
   - (a) she shall be classed by a Classification Society which is a member of the International Association of Classification Societies;
   - (b) she shall be in every way fit to carry crude petroleum and/or its products;
   - (c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator, radar, computers and computer systems) in a good and efficient state;
   - (d) her tanks, valves and pipelines shall be oil-tight;
   - (e) she shall be in every way fitted for burning, in accordance with the grades specified in Clause 29 hereof:
     - (i) at sea, fuel oil for main propulsion and fuel oil/marine diesel oil* for auxiliaries;
     - (ii) in port, fuel oil/marine diesel oil* for auxiliaries;
   - (f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;
   - (g) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;
   - (h) she shall comply with the description in the OCIMF Harmonised Vessel Particulars Questionnaire appended hereto as Appendix A, provided however that if there is any conflict between the provisions of this questionnaire and any other provision, including this Clause 1, of this charter such other provisions shall govern;
   - (i) her ownership structure, flag, registry, classification society and management company shall not be changed;

**Safety Management**

   - (j) Owners will operate:
     - (i) a safety management system certified to comply with the International Safety Management Code ("ISM Code") for the Safe Operation of Ships and for Pollution Prevention;
     - (ii) a documented safe working procedures system (including procedures for the identification and mitigation of risks);
     - (iii) a documented environmental management system;
     - (iv) documented accident/incident reporting system compliant with flag state requirements;
   - (k) Owners shall submit to Charterers a monthly written report detailing all accidents/incidents and environmental reporting requirements, in accordance with the "Shell Safety and Environmental Monthly Reporting Template" appended hereto as Appendix B;
   - (l) Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate compliance with the requirements of their HSE system and of this charter. Charterers reserve the right to confirm compliance with HSE requirements by audit of Owners.
   - (m) Owners will arrange at their expense for a SIRE Inspection to be carried out at intervals of six months plus or minus thirty days.

**Shipboard Personnel And their Duties**

2. (a) At the date of delivery of the vessel under this charter and throughout the charter period:
   - (i) she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;
   - (ii) all shipboard personnel shall hold valid certificates of competence in accordance

* Delete as appropriate.

* Delete as appropriate.

with the requirements of the law of the flag state;

(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1995 or any additions, modifications or subsequent versions thereof;

(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge there from to be carried out quickly and efficiently;

(v) the terms of employment of the vessel's staff and crew will always remain acceptable to The International Transport Worker's Federation and the vessel will at all times carry a Blue Card;

(vi) the nationality of the vessel's officers given in the OCIMF Vessel Particulars Questionnaire referred to in Clause 1(h) will not change without Charterers' prior agreement.

(b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers;

(i) prosecute all voyages with the utmost despatch;

(ii) render all customary assistance; and

(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

**Duty to Maintain**

3. (a) Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

(b) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.

Any reduction of hire under this sub-Clause (b) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.

(c) If Owners are in breach of their obligations under Clause 3(a)), Charterers may so notify Owners in writing and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(a), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

(d) Owners shall advise Charterers immediately, in writing, should the vessel fail an inspection by, but not limited to, a governmental and/or port state authority, and/or terminal and/or major charterer of similar tonnage. Owners shall simultaneously advise Charterers of their proposed course of action to remedy the defects which have caused the failure of such inspection.

(e) If, in Charterers reasonably held view:

(i) failure of an inspection, or,

(ii) any finding of an inspection,

referred to in Clause 3 (d), prevents normal commercial operations then Charterers have the option to place the vessel off-hire from the date and time that the vessel fails such inspection, or becomes commercially inoperable, until the date and time that the vessel passes a re-inspection by the same organisation, or becomes commercially operable, which shall be in a position no less favourable to Charterers than at which she went off-hire.

(f) Furthermore, at any time while the vessel is off-hire under this Clause 3 (with the exception of Clause 3(e)(ii)), Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (f) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof).

**Code word for this Charter Party**
**"SHELLTIME 4"**

**Issued December 1984 amended December 2003**

Period, Trading Limits and Safe Places

4\. (a) Owners agree to let and Charterers agree to hire the vessel for a period of ***See main terms attached*** plus or minus days in Charterers' option, commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular; ***See main terms attached***

in any part of the world, ***See main terms attached*** as Charterers shall direct, subject to the limits of the current British Institute Warranties and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35, Charterers may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owner's consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order.

(b) Any time during which the vessel is off-hire under this charter may be added to the charter period in Charterers' option up to the total amount of time spent off-hire. In such cases the rate of hire will be that prevailing at the time the vessel would, but for the provisions of this Clause, have been redelivered.

(c) Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.

(d) Unless otherwise agreed, the vessel shall be delivered by Owners dropping outward pilot at a port in ***at the arrival anchorage Guanta, Venezuela with COT clean and free of slops***

at Owners' option and redelivered to Owners dropping outward pilot at a ***safe*** port in ***Colombia***

at Charterers' option.

(e) The vessel will deliver with last cargo(es) of ***See main terms attached*** and will redeliver with last cargo(es) of ***See main terms attached***

(f) Owners are required to give Charterers days prior notice of delivery and Charterers are required to give Owners ***30/21/14/10/7/5/3 days approximate notice and 1 day definite*** days prior notice of redelivery.

Laydays/ Cancelling

5\. The vessel shall not be delivered to Charterers before ***28th March 2008*** and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before ***10th April 2008 to be narrowed by Owners to a 5 day spread latest 14th March 2008***

Owners to Provide

6\. Owners undertake to provide and to pay for all provisions, wages (including but not limited to all overtime payments), and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a Period when the vessel is on-hire.

Charterers to Provide

7\. (a) Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

(b) In respect of bunkers consumed for Owners' purposes these will be charged on each occasion

**Code word for this Charter Party**
**"SHELLTIME 4"**

Issued December 1984 amended December 2003

by Charterers on a "first-in-first-out" basis valued on the prices actually paid by Charterers.

(c) If the trading limits of this charter include ports in the United States of America and/or its protectorates then Charterers shall reimburse Owners for port specific charges relating to additional premiums charged by providers of oil pollution cover, when incurred by the vessel calling at ports in the United States of America and/or its protectorates in accordance with Charterers orders.

Rate of Hire

8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of United States Dollars *9250 (nine thousand two hundred and fifty)* per day, and pro rata for any part of a day, from the time and date of her delivery (local time) to Charterers until the time and date of redelivery (local time) to Owners.

Payment of Hire

9. Subject to Clause 3 (c) and 3 (e), payment of hire shall be made in immediately available funds to: *BNP Parisbas, Amsterdam, The Netherlands*
*Swift Code: BNPANL2A*
Account: *Chem-Tankers C.V., Maassen, The Netherlands*
*Account Number: NL41BNPA0227906829*

in United States Dollars per calendar month in advance, less:

(i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and;
(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and;
(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (c) or 24 hereof,

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.

In default of such proper and timely payment:

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due, including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and;

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

Space Available to Charterers

10. The whole reach, burthen and decks on the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed *100* tonnes at any time during the charter period.

Segregated Ballast

11. In connection with the Council of the European Union Regulation on the Implementation of IMO Resolution A747(18) Owners will ensure that the following entry is made on the International Tonnage Certificate (1969) under the section headed "remarks":
"The segregated ballast tanks comply with the Regulation 13 of Annex 1 of the International Convention for the prevention of pollution from ships, 1973, as modified by the Protocol of 1978 relating thereto, and the total tonnage of such tanks exclusively used for the carriage of segregated water ballast is *1298 cbm* The reduced gross tonnage which should be used for the calculation of tonnage based fees is *N/A*

Instructions And Logs

12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and the master shall keep a full and, correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

Bills of Lading

13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign Bills of Lading as Charterers or their agents may direct (subject always to Clauses 35 (a) and

40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise:

(i) from signing Bills of Lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such Bills of Lading fail to conform to the requirements of this charter, or (except as provided in Clause 13 (b)from the master otherwise complying with Charterers' or their agents' orders;

(ii) from any irregularities in papers supplied by Charterers or their agents.

(b) If Charterers by telex, facsimile or other form of written communication that specifically refers to this Clause request Owners to discharge a quantity of cargo either without Bills of Lading and/or at a discharge place other than that named in a Bill of Lading and/or that is different from the Bill of Lading quantity, then Owners shall discharge such cargo in accordance with Charterer's Instructions in consideration of receiving the following indemnity which shall be deemed to be given by Charterers on each and every such occasion and which is limited in value to 200% of the CIF value of the cargo carried on board:

* (i) Charterers shall indemnify Owners and Owners' servants and agents in respect of any liability loss or damage of whatsoever nature (including legal costs as between attorney or solicitor and client and associated expenses) which Owners may sustain by reason of delivering such cargo in accordance with Charterers' request.

(ii) If any proceeding is commenced against Owners or any of Owners' servants or agents in connection with the vessel having delivered cargo in accordance with such request, Charterers shall provide Owners or any of Owners' servants or agents from time to time on demand with sufficient funds to defend the said proceedings.

(iii) If the vessel or any other vessel or property belonging to Owners should be arrested or detained, or if the arrest or detention thereof should be threatened, by reason of discharge in accordance with Charterers instruction as aforesaid, Charterers shall provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and Charterers shall indemnify Owners in respect of any loss, damage or expenses caused by such arrest or detention whether or not same may be justified.

(iv) Charterers shall, if called upon to do so at any time while such cargo is in Charterers' possession, custody or control, redeliver the same to Owners.

(v) As soon as all original Bills of Lading for the above cargo which name as discharge port the place where delivery actually occurred shall have arrived and/or come into Charterers' possession, Charterers shall produce and deliver the same to Owners whereupon Charterers' liability hereunder shall cease.

Provided however, if Charterers have not received all such original Bills of Lading by 24.00 hours on the day 36 calendar months after the date of discharge, that this indemnity shall terminate at that time unless before that time Charterers have received from Owners written notice that:

a) Some person is making a claim in connection with Owners delivering cargo pursuant to Charterers request or;

b) Legal proceedings have been commenced against Owners and/or carriers and/or Charterers and/or any of their respective servants or agents and/or the vessel for the same reason.

When Charterers have received such a notice, then this indemnity shall continue in force until such claim or legal proceedings are settled. Termination of this indemnity shall not prejudice any legal rights a party may have outside this indemnity.

(vi) Owners shall promptly notify Charterers if any person (other than a person to whom Charterers ordered cargo to be delivered) claims to be entitled to such cargo and/or if the vessel or any other property belonging to Owners is arrested by reason of any such discharge of cargo.

vii) This indemnity shall be governed and construed in accordance with the English law and each and any dispute arising out of or in connection with this indemnity shall be subject to the jurisdiction of the High Court of Justice of England".

(c) Owners warrant that the Master will comply with orders to carry and discharge against one or more Bills of Lading from a set of original negotiable Bills of Lading should Charterers so require.

**Conduct of Vessel's Personnel**

14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.



**Code word for this Charter Party**
**"SHELLTIME 4"**

Issued December 1984 amended December 2003

Bunkers at Delivery and Redelivery

15. Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the price actually paid, on a "first-in-first-out" basis. Such prices are to be supported by paid invoices.
Vessel to be delivered to and redelivered from the charter with, at least, a quantity of bunkers on board sufficient to reach the nearest main bunkering port.
Notwithstanding anything contained in this charter all bunkers on board the vessel shall, throughout the duration of this charter, remain the property of Charterers and can only be purchased on the terms specified in the charter at the end of the charter period or, if earlier, at the termination of the charter.

Stevedores, Pilots, Tugs

16. Stevedores, when required, shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that;
(a) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and;
(b) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

Super-Numeraries

17. Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except alcohol. Charterers paying at the rate of United States Dollars 15 (fifteen) *25 (twenty five)* per day for each representative while on board the vessel.

Sub-letting/ Assignment/ Novation

18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. Additionally Charterers may assign or novate this charter to any company of the Royal Dutch/ Shell Group of Companies.

Final Voyage

19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for;
(a) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and;
(b) bunkers on board at redelivery pursuant to Clause 15.
Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.
If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.

Loss of Vessel

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

Off-hire

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner);
(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and



such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or;

(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or;

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or;

(iv) due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or;

(v) due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then;

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder; or otherwise, the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between;

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and;

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter period except where Charterers declare their option to add off-hire periods under Clause 4 (b)).

(f) All references to "time" in this charter party shall be references to local time except where otherwise stated.

Periodical Drydocking

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals of

On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers

***Owners guarantee that the vessel will not be drydocked during the validity of this charter party, except in an emergency.***

place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any Bill of Lading or this charter.

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However;

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and;

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24.

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account.

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.

**Ship Inspection**

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however:

(a) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and;

(b) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right.

**Detailed Description and Performance**

24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows:-

| Average speed in knots | Maximum average bunker consumption per day main propulsion fuel oil/ diesel oil | auxiliaries fuel oil/diesel oil |
|---|---|---|
| Laden | tonnes | tonnes |

***12.0 knots on 10 mt IFO 180 CST (RME35) + 1.0mt MGO (DMA)***

Ballast

***12.0 knots on 10 mt IFO 180 CST (RME35) + 1.0mt MGO (DMA)***

***The average speed and fuel consumption shall be calulcated by refernce to the observed distance from pilot station to pilot station on all sea passages, adjusted for adverse weather periods; i.e. any periods during which reduction of speed is necessary for safety in congested/ narrow waters and/or in poor visibility and excluding any time off hire.***

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown.

The service speed of the vessel is *12* knots laden and *12* knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating a decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be.

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being;

(i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility;

(ii) any days, noon to noon, when winds exceed force 8 *4* on the Beaufort Scale for more than 12 hours.

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24 (a) then if such shortfall or excess results;

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24 (a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be included in the performance calculation;

(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be included in the performance calculation.

The results of the performance calculation for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total performance calculation for such period.

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require.

(d) Owners and Charterers agree that this Clause 24 is assessed on the basis that Owners are not entitled to additional hire for performance in excess of the speeds and consumptions given in this Clause 24.

Salvage

25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25.

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

Lien

26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.

Exceptions 27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c) Clause 27(a) shall not apply to, or affect any liability of Owners or the vessel or any other relevant person in respect of;

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or;

(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. Any such claim shall be subject to the Hague-Visby Rules or the Hague Rules or the Hamburg Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant Bill of Lading (whether or not such Rules were so incorporated) or, if no such Bill of Lading is issued, to the Hague-Visby Rules unless the Hamburg Rules compulsorily apply in which case to the Hamburg Rules.

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

Injurious Cargoes 28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.

Grade of Bunkers 29. Charterers shall supply fuel oil with a maximum viscosity of *180* centistokes at 50 degrees centigrade and/or marine diesel oil for main propulsion and fuel oil with a maximum viscosity of *MGO* centistokes at 50 degrees centigrade and/or diesel oil for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with ISO Standard 8217 for Marine Residual Fuels and Marine Distillate Fuels as applicable. ***See additional Clauses 66 and 72***

Disbursements 30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire.
***It is agreed that Charterers are not to deal with master's cash requirements.***

Laying-up 31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay up. Charterers may exercise the said option any number of times during the charter period.

Requisition 32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such governments in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

Outbreak of War 33. If war or hostilities break out between any two or more of the following countries: U.S.A., the countries or republics having been part of the former U.S.S.R (except that declaration of war or

**Code word for this Charter Party**
**"SHELLTIME 4"**

Issued December 1984 amended December 2003

hostilities solely between any two or more of the countries or republics having been part of the former USSR shall be exempted), P.R.C., U.K., Netherlands, then both Owners and Charterers shall have the right to cancel this charter.

Additional War Expenses

34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

Any payments by Charterers under this clause will only be made against proven documentation. Any discount or rebate refunded to Owners, for whatever reason, in respect of additional war risk premium shall be passed on to Charterers.

War Risks

35. (a) The master shall not be required or bound to sign Bills of Lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified in writing or by radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all Bills of Lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

Both to Blame Collision Clause

36. If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their

claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

New Jason Clause

37. General average contributions shall be payable according to York/Antwerp Rules, 1994, as amended from time to time, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following position shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

Clause Paramount

38. Charterers shall procure that all Bills of Lading issued pursuant to this charter shall contain the following:

"(1)Subject to sub-clause (2) or (3) hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(2)If there is governing legislation which applies the Hague Rules compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If there is governing legislation which applies the United Nations Convention on the Carriage of Goods by Sea 1978 (hereafter the "Hamburg Rules") compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg Rules."

"(4)If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules, or Hamburg Rules, as applicable, such term shall be void to that extent but no further."

"(5)Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."

Insurance/ ITOPF

39. Owners warrant that the vessel is now, and will, throughout the duration of the charter:

(a) be owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited;

(b) be properly entered in *The North of England* P & I Club, being a member of the International Group of P and I Clubs;

(c) have in place insurance cover for oil pollution for the maximum on offer through the International Group of P&I Clubs but always a minimum of United States Dollars 1,000,000,000 (one thousand million);

(d) have in full force and effect Hull and Machinery insurance placed through reputable brokers

**Code word for this Charter Party**
**"SHELLTIME 4"**

Issued December 1984 amended December 2003

on Institute Time Clauses or equivalent for the value of United States Dollars *9.5 million* as from time to time may be amended with Charterers' approval, which shall not be unreasonably withheld.

Owners will provide, within a reasonable time following a request from Charterers to do so, documented evidence of compliance with the warranties given in this Clause 39.

Export Restrictions

40. The master shall not be required or bound to sign Bills of Lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped.

Charterers shall procure that all Bills of Lading issued under this charter shall contain the following clause:

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this Bill of Lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this Bill of Lading so far as the cargo so discharged is concerned".

The foregoing provision shall apply mutatis mutandis to this charter, the references to a Bill of Lading being deemed to be references to this charter.

Business Principles

41. Owners will co-operate with Charterers to ensure that the "Business Principles", as amended from time to time, of the Royal Dutch/Shell Group of Companies, which are posted on the Shell Worldwide Web (www.Shell.com), are complied with.

Drugs and Alcohol

42. (a) Owners warrant that they have in force an active policy covering the vessel which meets or exceeds the standards set out in the "Guidelines for the Control of Drugs and Alcohol On Board Ship" as published by the Oil Companies International Marine Forum (OCIMF) dated January 1990 (or any subsequent modification, version, or variation of these guidelines) and that this policy will remain in force throughout the charter period, and Owners will exercise due diligence to ensure the policy is complied with.

(b) Owners warrant that the current policy concerning drugs and alcohol on board is acceptable to ExxonMobil and will remain so throughout the charter period.

Oil Major Acceptability

43. If, at any time during the charter period, the vessel becomes unacceptable to any Oil Major, Charterers shall have the right to terminate the charter.

Pollution and Emergency Response

44. Owners are to advise Charterers of organisational details and names of Owners personnel together with their relevant telephone/facsimile/e-mail/telex numbers, including the names and contact details of Qualified Individuals for OPA 90 response, who may be contacted on a 24 hour basis in the event of oil spills or emergencies.

ISPS Code/US MTSA 2002

45. (a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and the US Maritime Transportation Security Act 2002 (MTSA) in relation to the Vessel and thereafter during the currency of this charter, Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) and the "owner" (as defined by the MTSA) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company" and the requirements of MTSA relating to the vessel and the "owner". Upon request Owners shall provide documentary evidence of compliance with this Clause 45(a) (i).

(ii) Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Owners or "the Company"/"owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for Owners' account.

(b) (i) Charterers shall provide Owners/Master with their full style contact details and shall ensure that the contact details of all sub-charterers are likewise provided to Owners/Master. Furthermore, Charterers shall ensure that all sub-charter parties they enter into during the period of this charter contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the

contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Charterers to comply with this sub-Clause 45(b) shall be for Charterers' account.

(c) Notwithstanding anything else contained in this charter costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for Charterers' account, unless such costs or expenses result solely from Owners' negligence in which case such costs or expenses shall be for Owners' account. All measures required by Owners to comply with the security plan required by the ISPS Code/MTSA shall be for Owners' account.

(d) Notwithstanding any other provision of this charter, the vessel shall not be off-hire where there is a loss of time caused by Chartererers' failure to comply with the ISPS Code/MTSA(when in force).

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Law and Litigation

46. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

(b) All disputes arising out of this charter shall be referred to Arbitration in London in accordance with the Arbitration Act 1996 (or any re-enactment or modification thereof for the time being in force) subject to the following appointment procedure:

(i) The parties shall jointly appoint a sole arbitrator not later than 28 days after service of a request in writing by either party to do so.

(ii) If the parties are unable or unwilling to agree the appointment of a sole arbitrator in accordance with (i) then each party shall appoint one arbitrator, in any event not later than 14 days after receipt of a further request in writing by either party to do so. The two arbitrators so appointed shall appoint a third arbitrator before any substantive hearing or forthwith if they cannot agree on a matter relating to the arbitration.

(iii) If a party fails to appoint an arbitrator within the time specified in (ii) (the "Party in Default"), the party who has duly appointed his arbitrator shall give notice in writing to the Party in Default that he proposes to appoint his arbitrator to act as sole arbitrator.

(iv) If the Party in Default does not within 7 days of the notice given pursuant to (iii) make The required appointment and notify the other party that he has done so the other party may appoint his arbitrator as sole arbitrator whose award shall be binding on both parties as if he had been so appointed by agreement.

(v) Any Award of the arbitrator(s) shall be final and binding and not subject to appeal.

(vi) For the purposes of this clause 46(b)any requests or notices in writing shall be sent by fax, e-mail or telex and shall be deemed received on the day of transmission.

(c) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay.

Confidentiality 47. All terms and conditions of this charter arrangement shall be kept private and confidential

Construction 48. The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

Appendix A: OCIMF Vessel Particulars Questionnaire for the vessel, as attached, shall be incorporated herein.

Appendix B: Shell Safety and Environmental Monthly Reporting Template, as attached, shall be incorporated herein.

Additional Clauses: As attached, shall be incorporated herein. ***Vessel's description, Questionnaire 88, Main Terms, Owners Additional Clauses and Charterers Additional Clauses as attached are incorporated in the Charter Party. In the event of conflict the above mentioned additions will prevail over those contained in the Shelltime 4 Charter Party form.***

| SIGNED FOR OWNERS | SIGNED FOR CHARTERERS |
|---|---|
| FULL NAME: MICHAEL ESKUNZ | FULL NAME |
| POSITION: CEO | POSITION |

# CHEM RIGEL / CODEDOM
# TIME CHARTER PARTY DATED 29TH FEBRUARY 2008
# MAIN TERMS

**PERIOD**

6 months Charterers option 6 months time charter +/- 7 days in Charterers option on the final period.

Optional period to be declared by Charterers 2 months prior to the end of the first period.

**CARGOES**

Upto full cargoes of Residual Oils (which Charterers have advised is very similar to Diesel Oil but has a dark colour. The specification provided by Charterers to Owners, as attached forms part of this Charter Party) and/or IFO 380 CST and/or Clean Petroleum Products.

**TRADING**

Caribbean Basin excluding Cuba and Orinoco River.

**DELIVERY**

At the arrival anchorage Guanta, Venezuela with COT clean and free of slops.

**REDELIVERY**

Dropping outward pilot Safe port Colombia in charterers option with last 3 cargoes clean unleaded undarker 2.5npa with COT clean and free of slops.

**LAYCAN**

28TH March – 10th April 2008 to be narrowed by owners to a 5 day spread latest 14th March 2008.

**HIRE**

USD9250pdpr to be paid on delivery and as per governing charter party.

Charterers to also pay USD1000 per month to owners or pro rata to cover representation and communication costs.

**LAST CARGOES ON DELIVERY**

| | |
|---|---|
| Last cargo | LAB in all tanks |
| Previous | Talloil and/or Caustic Potash Solution and/or UFR |
| Previous | Talloil and/or Ethanol |

**CHEM RIGEL / CODEDOM**
**TIME CHARTER PARTY DATED 29TH FEBRUARY 2008**
**CHARTERERS ADDITIONAL CLAUSES**

**CHARTERERS SUBLET CLAUSE**

Owners agree that Charterers shall have the right to sublet the vessel. However, Charterer shall always remain responsible for the fulfilment of this charter in all it's terms and conditions. "New" Charterers to be approved by Owners.

**DELIVERY/REDELIVERY INSPECTIONS**

It is agreed that these will be conducted by an independent surveyor contracted 50% by Owners and 50% by Charterers.

**OFFHIRE CLAUSE**

Owners have a total non-cumulative free offhire time of one (01) day per month for maintenance and repairs purposes. In case that offhire time exceed the twenty four (24) hours of free time, chartering daily rate will not be paid until the vessel is completed fitted to operate again in normal operational conditions. In the event that the offhire time exceeds four (4) days, including the twenty four (24) hours free time, the daily rate will not be paid until the vessel is restored to it's fully operational condition, or she will be substituted by a similar vessel to the subject of this charter party.

Charterers reserve the right to cancel this charter party after fifteen (15) days of a continuous offhire situation, in the case of technical problems.

In such case, Owners and Charterers to fin an amicable solution of cleaning the vessel to easy chemical standard.

Owners will endeavour to avoid more offhire times.



**CHEM RIGEL / CODEDOM**
**TIME CHARTER PARTY DATED 29TH FEBRUARY 2008**
**OWNER'S ADDITIONAL CLAUSES**

**49 OIL POLLUTION CLAUSE**

A) Owners warrant that throughout the duration of this charter the vessel will be:
   (i) Owned or demised chartered by a member of the "International Tanker Owners Pollution Federation Limited" (I.T.O.P.F.), and
   (ii) Properly entered in a member club of the International Group of P & I Clubs.

B) Owners warrant that the vessel carries on board a certificate of insurance as required by the Civil Liability Convention for Oil Pollution Damage. Owners further warrant that said certificate will be maintained effective throughout the duration of this charter.

C) Owners warrant that they have and will maintain throughout the period of this charter:
The standard oil pollution insurance cover, currently US $ 1.00 billion, available from their P & I Club.

**50 ROUTING**

In the interest of safety, Owner will recommend that the Master observe the recommendations as to traffic separation and routing which are issued from time to time by the International Maritime Organisation (IMO) or as promulgated by the State of the flag of the Vessel or the State in which the effective management of the Vessel is exercised.

When transiting the Florida Straits, Key Biscayne to the Dry Tortugas, the Vessel shall maintain a distance of not less than ten (10) miles off the outer navigational aids marking the reefs off the Florida coast.

Weather and safe navigation permitting. This clause in no way supercedes the Owner's/Master's obligations for the safe navigation of the Vessel.

**51 INTENDED CARGOES**

The vessel shall be fit in every way and shall be maintained to carry the IMO II/III type of cargoes listed in the Certificate of Fitness (C.O.F.) and Annex I type of products as per stainless steel manufacturer's product suitability list throughout the charter period.

The vessel has a valid MARPOL IOPP ANNEX I certificate and is fitted with oil discharge monitoring equipment.



52 **TRADE AND LOADING**

It is mutually understood between Owners and Charterers that the Vessel shall be employed in DPP/CPP products trade in the Caribbean Basin excluding Cuba and Orinoco River. The Vessel shall not trade to USA during this Charter Party.

All loading and discharging operations as well as the stowage and loading arrangements on board the Vessel are to be effected under the supervision and responsibility of the Master.

53 **TANK CLEANING**

The cleaning of the Vessel's tanks is to be performed by the Vessel's crew in Charterers time but at any time, day and night or Sundays and Holidays included, weather and port regulations permitting, upon Charterers request. Any fresh water used for the purpose of the tank cleaning to be supplied by/paid for by Charterers.

Charterers shall supply the necessary cleaning compounds, chemicals and cotton rags for tank cleaning purposes only, which costs shall be for Charterers account.

54 **CERTIFICATES**

Owners warrant that the Vessel complies with all applicable state, national and international laws and regulations, including but not limited to the US Port And Tanker Safety requirements, OPA 90 Vessel Response Plans requirements, IMO and MARPOL requirements and that the Vessel will be so maintained during the full period of the charter and any extensions thereof.

Owners warrant to have an approved Vessel Response Plan to meet the requirements of the Oil Pollution Act of 1990 (OPA 90) and further warrant to have identified and ensured the availability of through contract or other approved means, the necessary private response sources to respond to maximum extent possible to worst case discharging or substantial threat of such discharge. This will be maintained to continue to meet the requirements for the period of this charter.

Owners further warrant that the vessel meets all other statutory requirements which are necessary to call at any port within the trading limits set forth in the charter and will be so maintained for the period of this charter.

All national and international certificates to be kept clean and valid throughout the period of this charter, including but not limited to ISM, ISPS, Certificate of Fitness covering IMO Type 2+3 and MARPOL Annex 1+2 products, United States Coastguard Letter of Compliance, including the Vapour Return Endorsement, Certificate of Financial Responsibility (COFR), FMC Certificate and Non-Canadian Compliance.

All delays to the Vessel resulting from the failure of the Vessel or Owners to comply with aforesaid laws, rules and regulations shall be for Owners account.

Owners warrant that the Vessel shall at all times comply with the International Transport Federation (ITF) minimum wage guidelines in order to ensure the Vessel's ability to load and discharge at all ports and shall be in possession of an up-to-date ITF Certificate (Blue Card) or equivalent declaration.

55 **REPAIRS**

Owners to give Charterers maximum possible notice of their intention to effect repairs to the Vessel and shall indicate the estimated duration of such repairs in order to minimise disruption of Charterers schedule. If required by Owners, Charterers will allow for 24 hours per calendar month to the Owners for essential maintenance in close consultation with Charterers without upsetting Vessel schedule and at Owners time and expense.

56 **PORTABLE EQUIPMENT**

Owners agree and warrant that the Vessel shall at all times carry on board and maintain in efficient working condition the usual portable equipment required for efficient cargo handling/cargo servicing.

57 **CREWING**

The Vessel shall at all times be sufficiently and properly crewed so as to efficiently perform all duties and functions normally connected to the chemical or other products trade including but not necessarily limited to loading, discharging, transferring cargo and/or ballast, sweeping, cleaning tanks, etc.

58 **CREW EXPERIENCE**

The Master and senior officers to be fully conversant and competent with all operational aspects of a modern tanker.

All officers and rating shall be in possession of certificates/endorsements as required under the latest STCW convention.

The Master, Chief Officer and Chief Engineer shall be proficient in English, and the balance of the crew shall have a good speaking, reading, writing and understanding of the English language.

If the Charterers are dissatisfied with the conduct of the Master and/or any particular crew member, the Owners shall on receiving particulars of the complaint, promptly investigate the same and, if necessary, make changes in the appointment.

59 **P+C CLAUSE**

Owners Charterers and brokers undertake to keep the terms of this Charter Party private and strictly confidential and are not to report any contents to anybody. Master and officers shall be under strict orders from Owners not to show log books or otherwise inform unauthorised parties about Charterer's business.

60   VACCINATIONS

In case of any vaccinations, i.e. against Yellow Fever, Cholera, Smallpox, etc., it is required that Master, officers and crew are to be vaccinated at Owners expense by return and a corresponding certificate is to be kept on board.

61   DRUG AND ALCOHOL POLICY

Owners warrant that they have a policy on Drug and Alcohol Abuse (Policy) applicable to the Vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for the Control of Drugs and Alcohol on board ships, as well as ExxonMobil's Drug and Alcohol Policy.

Owners further that the policy will remain in effect during the entire duration of this Charter Party and that Owners shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or any test finding an impairment shall not in itself mean that the Owner has failed to exercise due diligence.

62   ICE CLAUSE

The Vessel shall not be obliged to force ice or to follow ice breakers. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in, he has liberty to sail to a convenient open place and await Charterers instructions.

63   CHARTERERS EXPENSES/REPRESENTATION

Charterers will pay a lumpsum of US $1000 per month or pro rata for representation and communication expenses.

64   DELIVERY

The Vessel will be delivered in to service on arrival at anchorage at Guanta, Venezuela with COT clean and free of slops.

65   REDELIVERY

Last 3 cargoes prior to redelivery to be clean unleaded and undarker than 2.5 NPA. Vessel to be redelivered on dropping last outward pilot at a safe Columbian port in Charterers option. Charterers to give Owners 30/21/14/10/7/5/3 days approximate and 1 day definite notice of redelivery.

66   FUEL OIL

Charterers shall order and pay for all fuel oil in accordance with Owners fuel oil specifications contained herein from major or recognised independent suppliers. However, Charterers expressly disclaims any liability whatsoever for the quality of the fuel thus supplied. Master has the right to reject fuel that is not in accordance with the specifications in the Charter Party. All fuel supplied shall be in accordance with the latest ISO 8217 publication.

67   SHIP-TO-SHIP TRANSFER

Charterers shall have the right to direct the Vessel to load/discharge part or all her cargo into or out of any other vessel or lighter via ship-to-ship transfer, always in accordance with procedures recommended by ICS/OCIMF ship-to-ship transfer guide. It is understood and agreed that the crew of Owners vessel will be required to and will assist in handling fenders, cargo hoses, as well as in mooring operations. Charterers are free to use the vessel's cargo hoses for ship-to-ship transfer operations. In the event special equipment will be required for ship-to-ship transfer same to be arranged by Charterers at their expense.

Ship-to-ship transfer operation in open sea or at anchor outside port limits always to be subject to Master's approval of feasibility which not to be unreasonably withheld and provided permitted by relevant authorities. In the event of an accident during ship-to-ship transfer operation, Charterers to assist Owners in handling claims with the lightering barge/ship.

68   HOUSEFLAG

The Charterers have the option to fly their house flag and furthermore paint the vessel's funnel and sides with their colours at Charterers time and expense.

69   MASTER'S AUTHORITY

The Owners, the Charterers, or the Company, as defined in REG IX/1 (of SOLAS), operating the ship or any other person shall not prevent or restrict the Master of the ship from taking or executing any decision which, in the Master's professional judgement is necessary for safe navigation and protection of the marine environment.

70   CANAL & SEAWAY FITTINGS

The Vessel is fully fitted to transit the Suez Canal, Panama Canal, Owners will not be required to alter the physical capabilities of the Vessel.

71 MONITORING

Charterers are to be authorised to monitor the Vessel's movements via a vessel tracking service during the entire time charter. Any expenses related to this are for the Charterers account.

72 BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005

A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers failure to comply with this Sub-clause A)

B) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause A), the Owners warrant that:

i) The Vessel shall comply with regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

ii) The Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade in any such zone. Subject to having supplied the Vessel with fuels in accordance with Sub-clause A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 an 18 of MARPOL Annex VI.

C) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

QUESTIONNAIRE 88 (Version 2)

**INTERTANKO'S STANDARD TANKER VOYAGE CHARTERING QUESTIONNAIRE 1988 (Version 2)**
*(Metric system to be applied, HVPQ reference specified where applicable)*

| GENERAL INFORMATION | | HVPQ Ref |
|---|---|---|
| Date Updated: | Feb 26, 2007 | |
| Vessel's name: | Chem Rigel | 1.2 |
| IMO number: | 9189964 | 1.3 |
| Vessel's previous name(s): | SOUTHERN NOBLE | 1.4-1.7 |
| Flag: | Marshall Island | 1.8 |
| Port of Registry: | MAJURO | 1.9 |
| Call sign: | V7HY4 | 1.11 |
| Inmarsat phone number: | 453846339 | 1.12 |
| Fax number: | 653898067 | 1.13 |
| Email address: | chemrigel@ex.mail65.com.sg | 1.16 |
| Type of vessel: | CHEMICAL & OIL | 1.17 |
| Type of hull: | Double Hull | 1.19 |
| **OWNERSHIP & OPERATION** | | |
| Registered owner - Full Style: | CHEM RIGEL SA<br>C/O,<br>Aksay Denizcilik ve Tic. A.S. Gardenya Plaza2<br>42-2 Blok,<br>Atasehir-Istanbul/Turkey<br>Tel: +90 216 4554400<br>Fax: +90 216 4554398/99<br>Telex: 36736 EKSAY TR, 367<br>Email: info@aksay.org | 1.20 |
| Technical operator - Full Style: | Aksay Denizcilik ve Ticaret A.S<br>Gardenya Plaza 2,<br>42A Blok Atasehir,<br>Istanbul/Turkey<br>Tel: +90 216 4554400<br>Fax: +90 216 4554398/99<br>Telex: 36736 EKSAY TR, 367<br>Email: info@aksay.org | 1.22 |
| Commercial operator - Full Style: | Chem-Tankers C.V.<br>Safariweg 50<br>3605 MA Maarssen<br>The Netherlands<br><br>Tel: +90 216 4554400<br>Fax: +90 216 4554398/99<br>Telex: 36736 EKSAY TR, 367<br>Email: info@aksay.org | 1.25 |
| Disponent owner / Bareboat charterer - Full Style: | Tel:<br>Fax:<br>Telex:<br>Email: | |
| Number of vessels in disponent owner's fleet:: | 21 | |
| **BUILDER** | | |
| Where Built : | SHITANOE SHIP BULDING | 1.26 |
| Date Delivered: | Nov 26, 1998 | 1.31 |

| CLASSIFICATION | | |
|---|---|---|
| Vessel's classification society: | Nipon Kaiji Kyokai | 1.34 |
| Class notation: | TANKER, OILS FLASH POINT BELOW 60 C AND CHEMICALS TYPE II & III | 1.35 |
| If Classification society changed, name of previous society? | | 1.36 |
| If Classification society changed, date of change? | Not Applicable | 1.37 |
| Last dry-dock: | Nov 22, 2004 | 1.38 |
| Last special survey: | Oct 21, 2003 | 1.41 |
| Latest CAP Rating (if applicable) | | 1.44 |
| Last annual survey: | Dec 30, 2005 | 1.45 |
| Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS)? | Yes | |

| DIMENSIONS | | |
|---|---|---|
| LOA (Length Over All): | 93.37 Metres | 1.49 |
| Extreme breadth: | 14.82 Metres | 1.51 |
| KTM (Keel to Masthead): | 26.94 Metres | 1.54 |
| BCM (Bow to Center Manifold): | 41.48 Metres | 1.57.1 |
| Lightship parallel body length: | 27.63 Metres | 1.57.3 |
| Normal ballast parallel body length: | 34.95 Metres | 1.57.6 |
| Parallel body length at Summer DWT: | 42.31 Metres | 1.57.9 |

| TONNAGES | | |
|---|---|---|
| Net Tonnage: | 1110 | 1.59 |
| Gross Tonnage: | 2612 | 1.60 |
| Suez Net Tonnage: | 2793 | 1.61 |
| Panama Net Tonnage: | 2348 | 1.62 |

| LOADLINE INFORMATION | Freeboard (Metres) | Draft (Metres) | Deadweight (Tonnes) | Displacement (Tonnes) | |
|---|---|---|---|---|---|
| Summer: | 1.361 Metres | 5.862 Metres | 4065 Metric Tonnes | 5769 Metric Tonnes | 1.63 |
| Winter: | 1.483 Metres | 5.74 Metres | 3928 Metric Tonnes | 5632 Metric Tonnes | 1.64 |
| Tropical: | 1.239 Metres | 5.984 Metres | 4203 Metric Tonnes | 5907 Metric Tonnes | 1.65 |
| Lightship: | 5.273 Metres | 1.95 Metres | 0 Metric Tonnes | 1703 Metric Tonnes | 1.66 |
| Normal Ballast Condition: | 3.853 Metres | 3.37 Metres | 1418 Metric Tonnes | 3121 Metric Tonnes | 1.67 |

| | | |
|---|---|---|
| TPC on summer draft: | 11.22 Metric Tonnes | 1.70 |
| Does vessel have Multiple SDWT? | No | 1.72 |
| If yes what is the maximum assigned Deadweight? | Metric Tonnes | 1.73 |
| Air draft (sea level to top of mast/highest point) in normal SBT condition? | 23.570 Metres | 1.74 |

| RECENT OPERATIONAL HISTORY | | |
|---|---|---|
| Has vessel been involved in any collision, grounding or pollution incident the past 12 months, full description: | Pollution: No<br>Grounding: No<br>Collision: No | 1.77-1.79 |

| CERTIFICATION | | |
|---|---|---|
| Owners warrant following certificates to be valid throughout the Charter Party period: | | |
| SOLAS Safety Equipment: | Nov 25, 2008 | 2.2 |
| SOLAS Safety Radio: | Nov 25, 2008 | 2.3 |
| SOLAS Safety Construction: | Nov 25, 2008 | 2.4 |
| Load line: | Nov 25, 2008 | 2.5 |
| IOPPC: | Nov 25, 2008 | 2.6 |
| Safety Management (ISM): | Oct 14, 2010 | 2.8 |
| USCG COC: | Nov 08, 2007 | 2.11 |

| | | |
|---|---|---|
| CLC: | | |
| US COFR: | Feb 20, 2007 | 2.13 |
| Certificate of Fitness (Gas/Chemicals): | Nov 01, 2008 | 2.15 |
| | Gas: Chem: Nov 25, 2008 | 2.16 & 2.17 |
| Certificate of Class: | Nov 25, 2008 | |
| ISPS ISSC: | Oct 14, 2010 | |
| **DOCUMENTATION** | | |
| Does the vessel have the following documents on board? | | |
| International Safety Guide for Oil Tankers & Terminals (ISGOTT): | Yes | 2.28 |
| OCIMF/ICS Ship to Ship Transfer Guide (Petroleum): | Yes | 2.31 |
| Is the vessel entered with ITOPF? | Yes | |
| **CREW MANAGEMENT** | | |
| Nationality of Master | TURKEY | |
| Nationality of Officers: | Turkish | 3.1 |
| Nationality of Crew: | TURKISH | 3.2 |
| If Officers/Crew employed by a Manning Agency - Full Style: | Officers: Crew: | 3.1 & 3.2 |
| What is the common working language onboard? | Turkish | 3.1 |
| Do key officers understand English? | Yes | |
| In case of Flag Of Convenience (FOC), is the ITF Special Agreement on board? | N/A | |
| **STRUCTURAL CONDITION** | | |
| Are cargo tanks coated? | N/A | 7.1 |
| If Yes, specify type of coating: | | 7.1.1 |
| If cargo tanks are coated, specify to what extent: | | 7.1.3 |
| Are slop tanks coated? | | |
| If slop tanks are coated, specify to what extent: | | |
| **CARGO & BALLAST SYSTEMS** | | |
| If double hull, is vessel fitted with centreline bulkhead in all cargo tanks? | Yes, Perforated | 8.2 |
| Groups / Tank Capacities | | 8.3 |
| Total cubic capacity 98% ex slop tank: | 3985.52 Cu. Metres | 8.4 & 8.6 |
| Slop tank(s) capacity 98%: | 0 Cu. Metres | 8.5 & 8.7 |
| SBT or CBT? | SBT | |
| If SBT, what percentage of SDWT can vessel maintain with SBT only? | 32.7 % | 8.14.2 |
| If SBT, does vessel meet the requirements of MARPOL Reg 13(2)? | Yes | 8.14.3 |
| Number of natural segregations with double valve: | 8 | 8.15 |
| **CARGO PUMPS** | | |
| Type / number / capacity: | 8 x 230 Cu. Metres/Hour (Centrifugal) | 8.18-8.25 |
| **GAUGING AND SAMPLING** | | |
| Can tank innage/ullage be read from the CCR? | No | 8.48 |
| Can vessel operate under closed conditions in accordance with ISGOTT 7.6.3? | Yes | 8.51 |
| Type of tank gauging system (radar / floating / other) | Floating | 8.51.1 |
| Are high level alarms fitted and operational in cargo tanks? | Yes | 8.54 |
| **VAPOUR EMISSION CONTROL AND VENTING** | | |
| Is a vapour return system fitted? | Yes | 8.65 |
| State what type of venting system is fitted: | HIGH VELOCITY PV VALVES | 8.67 |
| Max loading rate per midships connection for homogenous cargo? | 200 Cu. Metres/Hour (per manifold) 400 Cu. Metres/Hour (total) | 8.79 |
| **CARGO MANIFOLDS** | | |

| | | |
|---|---|---|
| Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes | 8.80 |
| What is the number of cargo connections per side? | 8 | 8.83 |
| What is the size of cargo connections? | 150 Millimetres | 8.84 |
| What is the material of the manifold? | ST ST | 8.86 |
| Distance between cargo manifold centres: | 500 Millimetres | 8.93 |
| Distance ships rail to manifold: | 2750 Millimetres | 8.95 |
| Distance main deck to centre of manifold: | 2300 Millimetres | 8.97 |
| Height of manifold connections above the waterline at loaded (Summer Deadweight) condition? | 4.63 Metres | 8.101 |
| Height of manifold connections above the waterline in normal ballast? | 8.16 Metres | 8.102 |
| Is vessel fitted with a stern manifold? | No | 8.104 |
| Number / size reducers: | 1 x 75/100mm (3/4")<br>4 x 150/200mm (6/8")<br>4 x 100/150mm (4/6")<br>2 x 150/250mm (6/10")<br>1 x 150/300mm (6/12") | 8.106-8.110 |
| | | |
| **CARGO HEATING** | | |
| Type of cargo heating system? | steam | 8.120 |
| Material of heating system? | stainless steel | 8.128 |
| Max load temp: | 80 Degrees Celsius | |
| Max temp maintain: | 60 Degrees Celsius | |
| | | |
| **IGS & COW** | | |
| Is an Inert Gas System (IGS) fitted? | No | 9.1 |
| Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | | 9.3 |
| Is a Crude Oil Washing (COW) installation fitted? | N/A | 9.17 |
| | | |
| **MOORING ARRANGEMENTS** | | |
| Number / length / diameter of wires: | None | 10.2-10.5 |
| | | |
| Breaking strength of wires: | None | 10.2-10.5 |
| | | |
| Number / length / diameter of ropes: | On Drums<br>Forecastle: 2 / 220 / 52<br>Poop: 2 / 220 / 52<br><br>Other Lines<br>Forecastle: 5 / 220 / 52<br>Poop: 5 / 220 / 52 | 10.11-10.18 |
| | | |
| Breaking strength of ropes: | Forecastle: 41 Metric Tonnes<br>Fwd main deck: Metric Tonnes<br>Aft main deck: Metric Tonnes<br>Poop: 51 Metric Tonnes | 10.11-10.18 |
| | | |
| Number and brake holding power of winches: | Forecastle: 2 / 22.5<br>Poop: 2 / 22.5 | 10.22-10.25 |
| | | |
| How many closed chocks and/or fairleads of enclosed type are fitted on: | | |
| Focsle: | | |
| Main deck fwd: | | |
| Main deck aft: | | |
| Poop: | | |
| | | |
| **SINGLE POINT MOORING (SPM) EQUIPMENT** | | |
| Fairlead size: | | 10.48 |
| Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings | N/A | 10.60 |

| | | |
|---|---|---|
| (SPM)'? | | |
| Is vessel fitted with chain stopper(s)? | N/A | 10.61 |
| Number: | | 10.61.1 |
| Type: | | 10.61.2 |
| SWL: | Metric Tonnes | 10.61.3 |
| Max diameter chain size: | Millimetres | 10.62 |
| **LIFTING EQUIPMENT** | | |
| Derrick(s) - Number / SWL: | 0 / Metric Tonnes | 10.75 |
| Crane(s) - Number / SWL: | 1 / 0.9 Metric Tonnes | 10.76 |
| **ENGINE ROOM** | | |
| What type of fuel is used for main propulsion? | IFO 180 CST | 12.5 |
| What type of fuel is used in the generating plant? | MDO | 12.14 |
| **MISCELLANOUS** | | |
| P & I Club name: | NORTH OF ENGLAND | |
| Last three cargoes (Last / 2nd Last / 3rd Last): | LAB<br>DOP/Phos Acid/MEG<br>MEG | |
| Last three charterers (Last / 2nd Last / 3rd Last): | Themphos/Petresa/BASF | |
| Last three voyages (Last / 2nd Last / 3rd Last): | Caribs/Cont<br>Cont/WAF<br>Spain/Caribs | |
| Date of last SIRE Inspection: | | |
| Date of last CDI Inspection: | | |
| Current Oil Major Company Acceptances (TBOOK): | CDI / BP | |
| Date and place of last Port State Control: | Feb 14, 2006 / LE HAVRE | |
| Any outstanding deficiencies as reported by any Port State Control? | No | |
| If yes, provide details: | | |
| **FOR USA CALLS ONLY** | | |
| Qualified individual (QI) - Full Style: | Tel:<br>Fax:<br>Telex:<br>Email: | |
| Oil Spill Response Organization (OSRO) -Full Style: | Tel:<br>Fax:<br>Telex:<br>Email: | |
| Has owner, manager, or operator signed the Sea Carrier Initiative agreement with US customs concerning drug smuggling? | N/A | |

Revised: July 2004 (INTERTANKO.com / Q88.com)

# EXHIBIT B

*Wednesday, June 11th 2008*

## Big fuel smuggling dismantled by armed forces, in the eastern part of the country



The Navy and the National Guard of Venezuela jointly detained a Colombian paramilitary organization operating in the country to obtain Venezuelan fuels.

The dismantlement occurred in the town of Guiria, Sucre State. 22 trucks and a vessel tanker (CHEM RIGEL)-this one while loading its tanks with approximately 3.5 million oil sub-products litters -were detained heading to Colombia with the pretext of carrying residual oils or oil waste.

PDVSA security department noticed a series of irregular events regarding fuel management and supply, in the eastern part of the country. According to what said by the authorities – Navy, Disip and NG- after having carried out a series of raids and detentions that bring them to uncover a big gang leaded by Colombian paramilitary organizations. Taking advantage of all the money get from crime and links to civil and military representatives in Venezuela, these organizations have developed several enterprises with a false legal appearance in order to evade or try to evade national authorities. This time they were caught in flagrante. Some of their members were detained and by now identified by the authorities. Among wanted by the police there are two Colombians, Pastrana and Díaz, and a Chinese.

In Guanta, Anzoátegui State, and in Punto Fijo, Falcón State, another tanker (SEA GULL) has been considered suspicious by the authorities, since it apparently arrived with averages and low fuel, from Colombia. The authorities are investigating if it has any connection to the vessel detained in Guiria, as the tanker has also a 4 million litter capacity. Investigation follow-up was useful for dismantling this fuel smuggling now in Guiria, Sucre State. It is important to mention that the exporting company (TOMSCA-) of this loading in Guiria is the same that during the past December was responsible of 3-million-hydrocarbon-liters illegal loading in two vessels heading to Colombia, the ANA B and the MATEO I. The former was released under "suspicious" conditions, and the latter detained and according to some inquiries is owned or represented for industrial fisher by Onever. This case is being carried out by the 42nd public prosecutor's office of Anzoátegui State.

Our armed forces as well as the coastguard commando of the navy must be congratulated, since they have achieved a new success in the constant fight against crime. It is now the time for national courts, under a political orientation, to put in jail these offenders, who attempted to bring in our country their criminal operations and their plans to undermine the society and the Venezuelan government.

*Date: 04/16/2008*

*Miércoles, 11 de Junio del 2008*

## Duro golpe al contrabando de combustible asestan fuerzas armadas en el oriente del pais.

Una acción combinada de la ARMADA y GUARDIA NACIONAL, ha permitido la detención de parte de una organización paramilitar colombiana, la cual utiliza al territorio nacional para conseguir por medios ilícitos combustibles venezolanos.

En caso que nos referimos ocurre en la población de Guiria, estado Sucre, donde han sido detenidas 22 gandolas, así como un buque tanquero (CHEM RIGEL) cuando este iniciaba a llenar sus tanques con aproximadamente 3,5 millones de litros de productos petroleros, que iban con destino a Colombia bajo la figura de aceites residuales o desechos de petróleo.

El departamento de seguridad de PDVSA, estaba observando unas series de irregularidades con el suministro y manejo de combustibles, en el Oriente del país; Así se lo hicieron saber a las autoridades, (Armada, Disip y GN) las cuales luego de una serie de allanamientos, detenciones, han descubierto a parte de una gran banda, la cual es liderada por Paras colombianos, estos aprovechándose de sus cuantiosos fondos provenientes del delito y de conexiones con algunos personeros civiles y militares en Venezuela, han desarrollado unas series de empresas con fachada legal, para de esa manera burlar o tratar de burlarse de las autoridades nacionales, solo que esta vez han sido agarrados infraganti, en poco se sabrá de algunas detenciones a sus integrantes, los cuales ya las autoridades tienen identificados, y entre los solicitados se encuentran unos ciudadanos colombianos de apellidos Pastrana y Díaz, así como un ciudadano de origen chino.

Tanto en Guanta, Estado Anzoátegui y Punto Fijo, Estado Falcón se ha puesto bajo lupa, otro tanquero (SEA GULL) que supuestamente llego con averías y poco combustible, procedente de Colombia; se investiga si tiene relación con la nave detenida en Guiria, esta nave también tiene capacidad de hasta 4 millones de litros, la continuación de esas Investigaciones sin duda han servido para dar este primer golpe ahora en Guiria, Estado Sucre. Es menester mencionar que la empresa exportadora (TOMSCA) de este embarque en Guiria, es la misma que en el mes de diciembre pasado embarcó ilegalmente 3 millones de litros de hidrocarburos en dos buques el "ANA B" el cual se dejó el libertad "sospechosamente" y el "MATEO I" que quedó detenido (ambos con destino a Colombia) y que según las averiguaciones pertenece o representante de la pesca industrial de nombre Onever. Este caso lo maneja la fiscalía 42 del Estado Anzoátegui.

Hay que felicitar a nuestras fuerzas armadas, al igual que al Comando de Guardacostas de la Marina de Guerra, quienes se han anotado un nuevo triunfo en su constante lucha contra el delito, toca ahora a los tribunales de la República colocar entre rejas a estos delincuentes que han tratado de traernos a nuestro país sus accionar criminal, siguiendo sin duda una orientación política, dentro de sus planes de socavar la sociedad y gobierno venezolano.

*Fecha: 16/04/2008*